UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


SCHOOL BOARD OF THE PARISH                    CIVIL ACTION
OF ST. CHARLES


VERSUS                                        NO: 04-2511


SHELL OIL CO., ET AL.                         SECTION: "J" (1)


**ORDER AND REASONS**

Before the Court are cross motions for summary judgment filed by defendants, Shell Oil Co., et al., ("Shell") (Rec. Doc. 39) and plaintiff, School Board of the Parish of St. Charles ("St. Charles")(Rec. Doc. 40). Having considered the record evidence, the memoranda of counsel, and the applicable law, the Court finds that St. Charles' Motion for Summary Judgment should be DENIED, and Shell's Motion for Summary Judgment should be DENIED as to the blended fuel and the marketability of self-consumed chemical waste gas, and GRANTED as to coke-on-catalyst, pyrolysis pitch, and the status of self-consumed chemical waste gas as a by-product.

## I. SUMMARY OF PERTINENT FACTS

St. Charles seeks to establish Shell's liability for taxes for the years 1995 – 2003 for its use and/or sale of various substances as fuel for its operations. Shell seeks to establish that it owes no taxes for the consumption of these substances.

Shell operates a manufacturing complex in Norco, Louisiana, which is in St. Charles Parish. The manufacturing complex contains both refining operations ("Shell Refining") and chemical operations ("Shell Chemical"). Shell Refining and Shell Chemical are separate legal entities and for the most part operate separately. However, they have a symbiotic relationship and are physically connected by a system of pipes. Shell Refining produces petroleum products from crude oil, and Shell Chemical produces petroleum-based chemical products. Shell Refining and Shell Chemical each generate streams composed of waste by-products of their primary production and of "off-spec" products that fail to meet the specifications necessary to be sold as they were intended. Shell also purchases chemical waste gas from Union Carbide as part of a contract resulting from a Consent Order with the Federal Trade Commission that required Shell to divest itself of the polypropylene segment of its facility. These three gas streams are collected through a converging system of pipes. At

2

the point of convergence natural gas is introduced into the
system and the entire stream flows into a large cylinder called
the blend drum.

The manufacturing processes at both Shell Refining and Shell
Chemical involve numerous pieces of equipment that require fuel.
The blended mixture of waste gasses and natural gas act as the
fuel for this equipment. The unattractive properties of the waste
streams make them impractical to burn without first mixing them
with natural gas to make a more consistent flame. The blend drum
serves a specific function by averaging out variances in the
unattractive properties among the various waste streams and the
attractive properties of natural gas. The operations routinely
require more fuel than the waste they produce, so natural gas is
required as fuel for production in addition to the waste streams.
To the extent that the waste gasses are burned as fuel, the
operations need to purchase that much less natural gas, and so
these waste streams have value for Shell. The blended fuel is
routed from the blend drum to various pieces of equipment at
Shell Refining and Shell Chemical that are designed to burn fuel
with its variable properties.

The blend drum is located on Shell Refining's property, but
Shell Chemical operates the blending facility and purchases the

3

natural gas from a third party for both facilities. As a matter
of internal accounting, Shell Chemical credits itself for the
volume of waste it introduces to the blend drum and then debits
from itself the amount of fuel it takes from the blend drum. The
difference between the debit and the credit is the amount of
natural gas used by Shell Chemical. Shell Refining initially
utilized the same debit and credit system of accounting that
Shell Chemical uses. However, in recent years the two have begun
using an invoicing system between them. Shell Refining invoices
Shell Chemical for the amount of waste it introduces to the blend
drum, and Shell Chemical pays Shell Refining based on the amount
of waste. Shell Chemical then invoices Shell Refining for the
total amount of blended fuel Shell Refining takes from the blend
drum, and Shell Refining pays Shell Chemical that amount. The
amount of money Shell Chemical pays for Shell Refining's waste
gas and the amount it receives for sending that volume of blended
fuel back are equal, so that the difference between the two
invoices is the cost of the natural gas purchased by Shell
Chemical but used by Shell Refining. Shell Refining and Shell
Chemical assign the waste gas the same price as natural gas for
purposes of this accounting or transaction. St. Charles seeks to
tax Shell based on this accounting or transaction for either the

4

sale or the use of blended fuel.

Shell Chemical directly consumes some of its chemical waste gas and does not send it to the blend drum or exchange it with Shell Refining.

In addition to waste gasses, Shell burns two other waste by-products that St. Charles seeks to tax, coke-on-catalyst and pyrolysis pitch. Coke-on-catalyst is the residue, coke, that builds up on a granular catalyst used in the refining of petroleum. As the coke builds up, the catalyst becomes less and less effective. Catalyst that has become covered with coke is removed from the refining process so that the coke can be burned off. The clean catalyst, having regained effectiveness, is then re-introduced to the refining process, along with fresh catalyst. The cycle of removing and re-introducing catalyst takes place about every ten minutes. In addition to cleaning the catalyst, the burning of coke-on-catalyst produces heat that is used by equipment, such that coke-on-catalyst is a fuel for the refining process. Coke-on-catalyst is never sold by Shell.

Pyrolysis pitch is the viscous residue left at the end of the chemical processing. The pyrolysis pitch is used as a fuel for specialized boilers at Shell's facilities, or it is blended with lighter petroleum products and sold to third parties. The

price of the blended pyrolysis pitch is less than the cost of the lighter petroleum used to make the blend, such that the pyrolysis pitch standing alone appears to have a negative value. However, Shell has made occasional sales of pyrolysis pitch standing alone.

## II. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). If that burden has been met, to survive summary judgment the non-moving party must then come forward and establish that there are genuine issues of material fact for each of the challenged elements of its claim for which it will bear the burden of proof at trial. *Id.* St. Charles will bear the burden of proving the reasonable market value of the articles it seeks to tax. *State v. BP Exploration & Oil Co., Inc.*, 686 So. 2d 823, 831 (La. 1997) (by implication); *see also id.* at 836 (J. Kimball, concurring).

### III. SUBSTANTIVE LEGAL BACKGROUND

A. SALES TAX, USE TAX, AND EXEMPTIONS

When a product is sold at retail, a sales tax is due from the buyer based upon the sales price. *See, e.g.*, La. R.S. 47:302(A)(1); *see also* Tax Ordinances of St. Charles Parish attached as Ex. A to Pl's MSJ (initially mirroring and later incorporating by reference Titles 47 and 33 of the Louisiana Revised Statutes). If the processor of a product could have sold the product, but instead uses it, then a use tax is due from the processor/user. The use tax is based upon the "cost price" of the product, which is the lesser of the reasonable market value of the product or the actual cost to make the end product. *See,* La. R.S. 47:301(3)(a)[1]. Therefore, if property has no reasonable

---

[1] The Louisiana Department of Revenue and Taxation has promulgated regulations construing section 301(3)(a). In defining "cost price" it clarifies "reasonable market value" as follows:

    b.    The statutory requirement for a comparison between reasonable market value and actual cost necessarily demands that both elements being compared be on a comparable basis.

    c.    For purposes of the comparison, the reasonable market value of tangible personal property is the amount a willing seller would receive from a willing buyer in an arms length exchange of similar property at or near the location of the property being valued. The amount which would be realized from a forced sale is not acceptable as the market value for this purpose.

61 La. Admin. Code pt. I, § 4301.

market value or costs nothing, it is not subject to a use tax.
Under the "lesser of" formula for determining use tax value, if
the Court determines that either the actual cost or the
reasonable market value is greater than zero, then the other
valuation must be determined to establish which is the lesser.
*See Louisiana v. BP Exploration & Oil, Inc.*, 686 So. 2d 823, 831
(La. 1997)(Calogero, C.J., concurring); 61 LA. ADMIN. CODE PT. I, §
4301. If a product is exempt from sales tax it is also deemed
exempt from use tax. LA. R.S. § 47:301(19)(a) & (b).

   During the period at issue in this case, Louisiana exempted
natural gas, La. R.S. § 47:305(g), and all energy sources used as
boiler fuel, except refinery gas, LA. R.S. § 47:305(h),[2] from
sales and use tax. Since July of 1996, Louisiana has exempted
from the definition of a taxable "use" the use of a residue or
by-product of the processing of articles for sale, unless that
by-product is refinery gas. LA. R.S. § 47:301(18)(d) ("by-
products exemption").

   Louisiana Constitution article 6 section 28 allows the state
to exempt local taxes except to the extent that authorized bonds

------

   [2] The regulatory exemption published in 1974 at LA. R.S.
47:305 was initially limited to coal and fuel oil used as boiler
fuel. That exemption was amended in 1980 to apply to all energy
sources used as boiler fuel.

are secured by those local taxes.[3] Therefore, even if a use is exempted by statute it could still be taxed at the rate tied to active bonds in existence at the time the exemption was enacted. However, if the article has no reasonable market value, then use of the article would not be taxed at all.

B. DEVELOPMENT OF THE BY-PRODUCT EXEMPTION

   1. *BP Oil (I)*

   In *BP Oil Co. v. Plaquemines Parish Gov't*, 651 So. 2d 1322 (La. 1994) ("*BP Oil (I)*") the Louisiana Supreme Court found that, because refinery gas and coke-on-catalyst are by-products of the refining of crude oil into finished products, that were not themselves further processed into an end product, they were not tax exempt under a provision that exempts raw materials that are used in processing. *Id.* at 1330. In a footnote, the Court stated clearly that by-products used as fuel in the refining processes were not tax-exempt. *Id.* at n.12. The Court then found that, because, following a 1985 amendment, refinery gas was first made generally tax exempt and then specifically excluded from tax-exempt status under a provision that made all energy sources used as boiler fuel exempt, refinery fuel was exempt when used for

_____

   [3] The constitutional amendment of article 6, section 28 effective December 11, 1996 did not change the bond security language.

9

something other than boiler fuel. *Id.* at 1331-32. Refinery fuel was not exempt when used as boiler fuel, but was taxable at a statutorily set rate of fifty-two cents per thousand cubic feet, adjusted for yearly fluctuations of crude oil price. *Id.* at 1328-29. The Court also held that coke-on-catalyst was exempt when used as boiler fuel under the boiler fuel exemption. *Id.* at 1331.

### 2. *BP Oil (II)*

In *Louisiana v. BP Exploration & Oil, Inc.*, 686 So. 2d 823 (La. 1997)("*BP Oil (II)*"), the Louisiana Supreme Court decided, among other things, that coke-on-catalyst had no market value and so was not taxable. *Id.* at 831. The Court also recognized that the holding in *BP Oil (I)* is no longer good law concerning the taxability of by-products used in production. *Id.* at 829 n.10. Following Act 29 of 1996 coke-on-catalyst is a specifically mentioned by-product completely exempt from "use" taxation.[4]

### 3. *Act 29 of 1996*

Following the Louisiana Supreme Court's holding in *BP Oil (I)* that using by-products is a taxable event, the legislature passed Act 29 of 1996, effective July 1, 1996, to exempt from the

---

[4] The coke-on-catalyst at issue in *BP Oil II* was consumed before Act 29 of 1996 went into effect, so the by-product exemption was not applicable. Also, the boiler fuel, or energy sources, exemption was suspended during the relevant period.

10

definition of "use" all by-products and residues created by
processing raw materials into articles for sale. *See* La. R.S. §
47:301(18)(d)(ii). Specifically listed in the exemption is coke-
on-catalyst. *Id.* Specifically excluded from the exemption is
"refinery gas." *Id.* at 301(18)(d)(iii).[5]

---

[5] The entirety of section 301(18)(d) is as follows:
(i) Notwithstanding any other provision of law to the contrary,
and except as provided in Item (iii) of this Subparagraph, for
purposes of state and political subdivision sales and use tax,
"use" means and includes the exercise of any right or power over
tangible personal property incident to the ownership thereof,
except that it shall not include the further processing of
tangible personal property into articles of tangible personal
property for sale.

(ii) Except as provided in Item (iii) of this Subparagraph for
refinery gas, for purposes of state and political subdivision use
tax, "use" shall not include the storage, consumption, or the
exercise of any other right of ownership over tangible personal
property which is created or derived as a residue or byproduct of
such processing. Such residue or byproduct shall include but
shall not be limited to catalyst cracker coke derived from crude
oil, wood chips, bark, and liquor derived from the processing of
sawlogs or pulpwood timber, or bagasse derived from sugarcane.

(iii) Notwithstanding any other provision of law to the contrary,
and notwithstanding the provisions of this Subparagraph, "use"
shall include the exercise of any right of ownership over the
consumption, the distribution, and the storage for use or
consumption in this state of refinery gas, except the sale to
another person, whether at retail or wholesale, only if the
refinery gas is ultimately consumed as an energy source by the
person who owns the facility in which it is created and is not
sold. Notwithstanding any other law to the contrary, the use of
refinery gas shall be taxed at the cost price value provided in
Subparagraph (3)(f) of this Section. If refinery gas, except for
feedstock, is sold to another person, whether at retail, or
wholesale, such sale shall be taxable and the sales price value

11

Act 29 of 1996 also overrode the Court's *BP Oil (I)* finding that refinery gas is generally exempt from tax, except when used as a boiler fuel. The language of former section 305(4)(a)(vii) that exempted refinery gas was deleted and rearranged. Following July 1, 1996, refinery gas consumed as an energy source by the person who owns the facility in which it is created and not sold is defined as a "use", taxable at the statutory fifty-two cent rate. *Id.* at 301(18)(d)(iii) in conjunction with 301(3)(f). During most of the period relevant to this case, refinery gas that was sold, rather than used on-site, was taxable at the greater of the price of natural gas or the actual sales price. *Id.* at 301(18)(d)(iii) in conjunction with 301(13)(d) (WEST 2001).[6] Section 301(13)(d) was amended by Act 458 of 2005,

---

shall be as provided for in Subparagraph (13)(d) of this Section. The provisions of this Item shall not apply to feedstocks.

[6] Before Acts 2005 No. 458, effective July 11, 2005, La. R.S. § 47:301(13)(d) read:
   "Notwithstanding any other provision of law to the contrary, for purposes of state and political subdivision sales and use tax, the 'sales price' of refinery gas and other petroleum byproducts, except for feedstock, not ultimately consumed as an energy source by the person who owns the facility in which the refinery gas or other petroleum byproduct is created as provided for in Subparagraph (18)(d) of this Section, but sold to another person, whether at retail, wholesale, or for further processing, shall be the average of the monthly spot market price per thousand cubic feet of natural gas delivered into pipelines in Louisiana as reported by the Natural Gas Clearing House and as determined by the Department of Revenue for natural gas severance

12

effective July 11, 2005, to remove the "actual sales price" language and make the provision the same as 3(f), such that for the tail end of the relevant period "sales" and "use" of refinery gas were both taxable at the fifty-two cent rate. *Id.* at 301(18)(d)(iii) in conjunction with 301(13)(d).

## IV. DISCUSSION

A. BLENDED FUEL

To Shell, mingling the waste streams with natural gas and burning the mixture to power equipment is an energy-conservative, environmentally attractive, and legally sanctioned method of disposal. By-products are usable as fuel tax-free, boiler fuel use is tax-free, natural gas use is tax-free, and refinery gas has a special, reduced, tax rate, which Shell pays. The best way to burn the by-product waste streams is to mix them with natural gas. If the waste streams were not burned as fuel, they would have to be flared into the atmosphere, disposed of in some other fashion, or else processing at the refinery would have to stop.

According to Shell, the invoicing between Shell Chemical and Shell Refining takes place, not to pay for the purchase of an end

---

tax purposes at the time of such sale, or the price for which such property is actually sold, whichever is greater, and such sale shall be taxable."

13

product called "Blend Drum Fuel", but so that each facility can pay for its share of the natural gas that has been purchased.

Shell argues that, in any event, no third party would buy Shell's waste, so even if some of it fails to fit an exemption, the tax owed on property with no reasonable market value is zero.

To St. Charles Parish, Shell Refining is selling Shell Chemical its waste gas as one of the raw materials that go into making a product called "Blend Drum Fuel", a less pure, cheaper alternative to natural gas. Shell Refining is also paying for a share of a second raw material, natural gas. Shell Chemical provides the third raw material, its own waste gas, as well as its share of the natural gas. Finally, the parties buy a fourth raw material from Union Carbide.

Shell Chemical then blends the final product, "Blend Drum Fuel", which is chemically and functionally distinct from the raw materials. Shell Chemical uses some of the "Blend Drum Fuel" itself and sells some of it to Shell Refining. Both of them avoid paying the full amount of taxes owed on the entire volume of the end product purchased/used by paying taxes based upon the, largely exempt, raw materials. To St. Charles, Shell's categorization of the raw materials is irrelevant because the "focus must be on the use of the personal property sought to be

14

excluded from taxation, rather than on the raw material which produces the personal property." *BP Oil (I)*, at 1330. St. Charles argues that the entire volume of "Blend Drum Fuel" bought/used by Shell should be taxed based upon the value of an equal volume of natural gas, since that is the price for which it is sold.

St. Charles Parish argues that, if the transaction between the Shell facilities is not a sale, nevertheless the internal accounting proves that the product has a value, and that they could sell "Blend Drum Fuel" on the market at that value, making use tax still appropriate. St. Charles points to the sales of Union Carbide chemical waste gas to Shell as an indicator of market value. In addition, St. Charles has filed two affidavits of parish officials asserting, without detail, that several taxpayers who generate refinery gas have sold refinery gas during the relevant periods. (Rec. Doc. 76 Exs. 1, 2.)

With regards to the affidavits indicating that refinery gas has been sold and taxed, the Court finds them only marginally helpful in resolving the issues before it. They provide no details to suggest that there is a market for refinery gas. In addition, a market value for refinery gas is one issue that the Court need not resolve. Refinery gas is not exempted from sales or use tax under Louisiana's by-products exemption and its

15

taxable value is set by statute. Shell pays use taxes on its
refinery gas at the statutory fifty-two cent rate, and would like
to continue to do so. The particular issue before the Court is
whether refinery gas, and the other streams, become something
else when they are blended together and redistributed, such that
a new marketable product is created. A second issue is whether
this product is then sold by Shell Chemical to Shell Refining.
The marketability of refinery gas has some bearing on this, but
the affidavits are not, as St. Charles claims, sufficient by
themselves to create a genuine issue of material fact.

　　　Similarly, the purchase of chemical waste gas from Union
Carbide does not raise much of a factual issue for blended fuel.
The polypropylene unit used to be an integral part of the Shell
facility. It created a waste stream that was consumed in other
parts of the facility, but that particular unit apparently does
not have the equipment suited to consuming its own waste. When
Shell was "forced" to sell the polypropylene unit to Union
Carbide under the FTC Consent Order, it was also "forced" to
enter into a contract whereby it would purchase the waste streams
from Union Carbide. Otherwise the polypropylene unit could not
function and Shell could not comply with the Consent Order.
Although this "forced" contract to buy chemical waste gas does

not rule out the possibility of a market for chemical waste gas, neither does it provide a basis for concluding that a market exists. "The amount which would be realized from a forced sale is not acceptable as the market value [for determining cost price]." 61 LA. ADMIN. CODE PT I, § 4301. And, although the marketability of chemical gas between facilities does have some bearing on the issue of whether the blended fuel is an article for sale or a gathering of wastes, it does not dispose of the issue.

Shell has taken the litigation stance that a by-product maintains its status as a by-product no matter the manipulation or use to which it is subsequently put. St. Charles has taken the litigation stance that any mixing or manipulation, no matter how incidental, transforms a by-product into a taxable product. The Court is unconvinced by either argument as a general proposition, but cannot yet determine the proper characterization for the blended fuel. Therefore, the Court finds that further development of the record and the parties' arguments is required to determine whether the blended fuel is more properly characterized as a taxable product, or a composite of largely exempt by-products and natural gas, or some other alternative, for example, refinery gas taxable at the statutory rate.

If the blended fuel is ultimately characterized as a product

17

and not a by-product, questions still remain as to whether the product has a "cost price" and what that value might be.

With regard to the transactions and use of blended fuel, several further issues of material fact and the inferences to be drawn from them remain. The substance of an agreement, not its form, controls its characterization for tax purposes. *Saenger Realty Corp. v. Grosjean*, 193 So. 710, 711 (La. 1940). Louisiana law recognizes that, as between closely-related companies, not all sales on paper are sales for tax purposes. *See, e.g., United Co. Printing Co. v. Baton Rouge*, 569 So. 2d 186 (La. App. 1 Cir. 1990) (finding no sales tax owed where the parent kept the accounting records for its subsidiary, paid its employees, owned its building and leased it rent free, paid for the raw materials for the product, invoiced the product at actual cost with no profit, exchanged no money in fact, and filed a single federal tax return for both companies); *compare Hilton Hotels Corp. v. Traigle*, 360 So. 2d 245 (La. App. 1st Cir. 1978) (finding sales tax owed where subsidiary has same officers and directors as parent, maintains no stock of products but acts as purchaser and deliverer for parent, and makes a small profit on sales to parent). The determination of whether facilities are closely-related enough to avoid sales tax on transactions involves a

18

factual inquiry into the relationship between the two. Several factors are considered including: 1) treatment of the two entities for federal tax purposes, 2) the purpose of the subsidiary or service company, 3) which entity employed workers, and 4) whether the transaction includes a profit. *See United Co.,* 569 So. 2d at 187-88.

Material questions remain as to the nature of the relationship between Shell Chemical and Shell Refining; either the record is insufficient or the issue has been inadequately briefed. Even if the Court were to find that the blended fuel is better characterized as a  product than a by-product, the issue remains whether the transaction between the two Shell entities is a sale that demonstrates market value. The entities that have been found to be too closely-related under Louisiana law appear to be much more integrated than Shell Refining and Shell Chemical. On the other hand, the existence of a profit margin *vel non* is given considerable weight, and the Shell entities are prohibited by their Shared Facilities Agreements from making a profit from the collection and distribution, i.e. the "sale",  of blended fuel.


B. Coke-on-catalyst

Both parties recognize that coke-on-catalyst is specifically mentioned as a tax-exempt by-product in La. R.S. § 47:301(18)(d)(ii), and that coke-on-catalyst used for boiler fuel falls under the boiler fuel exemption. Therefore, coke-on-catalyst is exempt from taxation except to the extent that active authorized bonds were secured by taxes at the time the exemptions were passed. La. Const. art. 6, sect. 28.

Shell argues that coke-on-catalyst has no market value, and so is exempt even from bond indebtedness. Shell argues that the volume of coke-on-catalyst produced is so great that the prospect of shipping it to a willing buyer, if such a buyer existed, rather than recycling it back into the refining process would require an impossible dedicated truck fleet and highway system.

St. Charles argues that coke-on-catalyst does have a market value because it is the equivalent in some respects of natural gas and its value is set by Shell's internal accounting at the price of natural gas. St. Charles argues in the alternative that the existence of technology that can convert coke-on-catalyst to a marketable form, while returning the catalyst to the refining process, shows that a market exists. Finally, St. Charles asserts that the by-product exemption violates the Commerce Clause of the United States Constitution and equal protection principles

20

because it discriminates in favor of in-state use over interstate sales of the same object.

*Maryland v. Louisiana*, 451 U.S. 725 (1981), cited by St. Charles in support of its Commerce Clause argument, is inapposite and actually precludes a ruling on constitutionality at this time. The initial determination that the Supreme Court in *Maryland v. Louisiana* makes is that the transactions at issue are in fact interstate commerce. *Id.* at 754-55. Next, the Court sets about determining whether the tax "in light of its actual effect...'will in its practical operation work discrimination against interstate commerce.'" *Id.* at 756 (quoting *Best & Co. v. Maxwell*, 311 U.S. 454, 455-56 (1940)). St. Charles has made no attempt to show that the by-products in this case are involved in interstate commerce. The record gives no indication that these by-products move in interstate commerce. In addition, the Court is unaware of any provision whereby the sale of Louisiana by-products in interstate commerce would be subject to a Louisiana sales tax. This Court, therefore, will not consider the constitutionality of Act 29 of 1996 based upon hypothetical interstate effects or discrimination. "It is fundamental that the judicial power to declare legislative action invalid upon constitutional grounds is to be exercised only in clear cases.

The constitutional invalidity must be manifest, and if it rests upon disputed questions of fact, the invalidating facts must be proved." *Simpson v. Shepard* (*The Minnesota Rate Cases*), 230 U.S. 352, 452-53 (1913).

St. Charles' second argument, that coke-on-catalyst is the equivalent of natural gas, was rejected by the Louisiana Supreme Court in *BP Oil II* when it affirmed *State v. Star Enterprises,* 691 So. 2d 1221 (La.App. 4th Cir. 1996). *BP Oil (II)*, 686 So. 2d at 831. Coke-on-catalyst does not have the market value of natural gas. In fact, the Louisiana Supreme Court found that coke-on-catalyst had no reasonable market value whatsoever. *Id.*

St. Charles has presented evidence in the form of an expert report that coke-on-catalyst is marketable because technology exists that allows some facilities to use it. Thus, St. Charles argues that coke-on-catalyst "is marketable to such a facility." Pl.'s Opp. Mem. (Rec. Doc. 45) at 15. Even resolving all doubt in favor of this opinion, it is insufficient to create a factual issue for trial. St. Charles has not provided any evidence that the Shell facilities in Norco have a market for coke-on-catalyst.

In arguing about blended fuel, Shell cites to several cases dealing with real estate appraisal for the proposition that to establish reasonable market value for use tax purposes, sales

must be in the vicinity of the property being valued.[7] These
cases are distinguishable to a large extent, but they stand for
the relevant common-sense proposition that the market value has
to be based on the potential market as it exists in relation to
the taxpayer. This also comports with the definition of
reasonable market value used by Louisiana courts and the
Louisiana Department of Revenue and Taxation as contemplating an
exchange "near the location" of the taxable event. *See BP Oil
(II)*, at 830; 61 LA. ADMIN. CODE PT I, § 4301.  Assuming some
utility value for Shell of coke-on-catalyst used as fuel, there
is nothing in the record to indicate that Shell has a potential
buyer. As the Louisiana Fourth Circuit put it, "[v]alue in use is
not the same as market value." *Star Enter.*, 691 So. 2d at 1229.
St. Charles cannot rely on conjecture, that a market might exist
somewhere or someday, to support its burden of proof.

St. Charles has failed to come forward with any evidence
that the coke-on-catalyst used at the Norco facilities has a
market and consequently a market value. Therefore, no use tax is
owed for Shell's use of coke-on-catalyst regardless of the

---

[7] *Simpson v. Shepard*, 230 U.S. 352 (1913); *United States v.
8.41 Acres of Land*, 680 F.2d 388, 395 (5th Cir. 1982); *State
Dept. of Transp. and Dev. v. C. Schexnayder, Inc.*, 485 So. 2d
939, 942 (La. App. 1st Cir. 1986).

existence of bond-indebtedness.

C. Pyrolysis Pitch

Both parties have come to recognize that the pyrolysis pitch used by Shell is fuel oil for boilers. Therefore, it is exempt under the 1974 exemption for fuel oil used as boiler fuel and its successor at LA. R.S. § 47:305(h). As with coke-on-catalyst, to the extent that there are active bonds from 1974 that are secured by taxes, pyrolysis pitch would be subject to use tax at the rate of bond security. Unlike coke-on-catalyst and the 1996 by-product exemption, there has been no representation to the Court that secured bonds were active during the relevant period that were in existence in 1974 when the fuel oil as boiler fuel exemption was enacted. If there were no active bonds from 1974, the Court need not decide whether a market value exists for pyrolysis pitch. The fuel oil as boiler fuel exemption would apply to any bonds approved after its enactment, making no tax owed for its use as boiler fuel.

D. Self-Consumed Chemical Waste Gas

Shell Chemical has come forward with sufficient evidence that some of the chemical waste gas stream does not go to the shared blend drum facility and is not included in any transactions, but is instead routed directly to equipment at Shell Chemical for consumption. Shell

seeks summary judgment that this "self-consumed" waste is exempt as a by-product under La. R.S. § 47:301(18)(d)(ii). St. Charles counter with several arguments.

St. Charles argues that Shell construes the exemption far too broadly. St. Charles reads the "such processing" language in the statute to require that, in order to be exempt, a by-product must be consumed in the same process that created it. When read as a whole, the exemption does not support St. Charles' limitation. *See* Footnote 5, *supra* for statutory text. Section 301(18)(d)(i) provides that "the further processing of tangible personal property into articles of tangible personal property for sale" is not a taxable use. Then subsection (ii), the very next sentence, exempts the consumption of by-products that are "created or derived as a residue or byproduct of such processing" unless the by-product is refinery gas. The plain language of the statute exempts all by-products <u>created</u> when articles are processed for sale, not <u>consumed by</u> those same processes.

St. Charles seeks to impose a restriction above and beyond that imposed by the statute without offering any authority for departing from the plain language. "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written." LA. CIV. CODE

art. 9. Even if  section 301(18)(d)(ii) were ambiguous, it is a well-settled principle of Louisiana law that where the meaning of a tax law is in doubt, it should be strictly construed against the collector and in favor of the tax payer. *See Tarver v. E.I. Du Pont De Nemours*, 634 So. 2d 356, 358 (La. 1994). The Court declines to adopt St. Charles' interpretation.

St. Charles also argues that as soon as waste gas enters the pipes at Shell Chemical and mixes with other waste gas, it is no longer an exempt by-product, but a new primary product the use of which is taxable. This is the "Blend Drum Fuel" argument taken to its logical extreme. As noted above, although the Court does not accept Shell's "once a by-product always a by-product" argument, neither does it accept St. Charles' "any change or mixing automatically destroys exempt status" argument. To accept St. Charles' interpretation would render the exemption almost meaningless, as any by-product must be manipulated to a greater or lesser degree before it can be consumed. It seems clear to the Court that there is a point between these two extremes where an exempt "by-product" is further processed into a taxable article of sale. *See BP Oil (I)*, 651 So. 2d at 1330 (determining status as by-product by the fact that material is not further processed into an article for sale). St. Charles has failed to come forward

with evidence that Shell manipulates or mixes the self-consumed chemical waste with or into anything. It is simply waste created as a by-product of the processing of chemical products. As such, its consumption is exempt from taxation under section 301(18)(d)(ii), except to the extent that active authorized bonds were secured by taxes at the time the exemptions were passed.

To the extent that secured bonds exist, taxes would be owed for the percentages pegged to those bonds based upon the lesser of the actual cost of chemical waste gas or its reasonable market value. As explained above, the Court disagrees that the purchases of Union Carbide's chemical waste gas establishes a market and thus a market value. Neither does the "forced" nature of the transaction indicate that no market exists as Shell implies. A question of fact remains as to the cost or reasonable market value of Shell Chemical's self-consumed chemical waste gas.

## V. CONCLUSION

St. Charles and Shell have both failed to establish that no material issues of fact, or inferences to be drawn from the facts, exist regarding the nature of the transaction, the taxable status, or the "cost price" of Shell's blended fuel. They have both failed to establish self-consumed chemical waste gas's "cost price". These issues remain to be decided after trial.

Shell has established that, even drawing all inferences in St. Charles' favor, it is entitled to judgment as a matter of law regarding the exempt status and the lack of a market for coke-on-catalyst. Shell has established as a matter of law the exempt status of pyrolysis pitch and self-consumed chemical waste gas.

Accordingly,

**IT IS ORDERED** that St. Charles' Motion for Summary Judgment (Rec. Doc. 40) is **DENIED**;

**IT IS FURTHER ORDERED** that Shell's Motion for Summary Judgment (Rec. Doc. 39) is **DENIED** in part, and **GRANTED** in part.

New Orleans, Louisiana this the 14th day of June, 2006.


CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

28