UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SCHOOL BOARD OF THE PARISH OF ST. CHARLES | CIVIL ACTION |
| VERSUS | NO: 04-2511 |
| SHELL OIL COMPANY, ET AL. | SECTION: "J" (1) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The issue of liability in the above-captioned case was tried without a jury on March 12th and 13th, 2007. Upon consideration of all of the evidence and argument of counsel, and pursuant to Fed. R. Civ. P. 52 (a), the Court issues the following findings of fact and conclusions of law.

*Background*

1.

Plaintiff St. Charles Parish School Board is a political subdivision of the State of Louisiana. Plaintiff is authorized to levy and collect a tax upon the sale at retail and the use of tangible personal property in St. Charles Parish. La. Const. art. 6 § 29. However, in applying the local tax ordinances plaintiff

is bound by the definitions provided in general state laws on sales and use taxes. *BP Oil Co. v. Plaquemines Parish Gov't,* 651 So. 2d 1322, 1328 (La. 1994).

2.

Plaintiff is a citizen of Louisiana. All defendants are citizens of states other than Louisiana. The amount in controversy exceeds $75,000.

3.

Diversity jurisdiction exists in this Court under 28 U.S.C. § 1332.

4.

Louisiana law applies to the substantive issues of this case. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79-80 (1938).

5.

The tax period at issue is January 1, 1995 to December 31, 2003.

6.

Defendants have at various times owned and operated facilities at a manufacturing complex in Norco, St. Charles Parish, Louisiana. One of the facilities at the complex ("Refining") produces petroleum products from crude oil, and another facility ("Chemical") produces petroleum-based chemical products. Prior to January 19, 1995, Chemical and Refining were

divisions of Shell Oil Company that shared certain facilities at the Norco complex. On January 19, 1995, Chemical became a separate corporate entity, a wholly-owned subsidiary of Shell Oil Company named Shell Chemical Company. On May 1, 1996, Refining also incorporated as a wholly-owned subsidiary of Shell Oil Company called Shell Norco Refining Company. On July 1, 1998, the Refinery assets were transferred to Motiva Enterprises, LLC ("Motiva"), a separate company that is owned by Texaco Refining Manufacturing Inc., Shell Oil Company, and Saudi Refining Company. Thus, during the period at issue in this case Refining and Chemical were evolving as separate legal entities that were nevertheless physically connected and shared certain manufacturing facilities between them.

7.

Because they had become separate legal entities that co-owned and utilized various portions of the same manufacturing complex, on May 1, 1996, Chemical and Refining entered into a Shared Facilities Agreement (SFA) to set the terms of shared ownership and use of co-owned Shared Facilities. Effective July 1, 1998, the SFA was updated to reflect the formation of Motiva. The SFAs designated Chemical as the operator of the co-owned Shared Facilities, including the Fuel Gas System that is the primary focus of this case.

8.

Chemical produces and sells products including butadiene, butalene, gasoline, and fuel oil. Chemical creates these products through a process in which the molecular arrangements of a number of feedstocks, such as gas oil, ethane, etc., are cracked by reactions occurring at high temperatures and low pressure. The molecules are then recombined into the desired products for sale.

9.

The cracking/recombination process at Chemical results in waste gas streams that contain methane, hydrogen, nitrogen, small amounts of ethylene and ethane, and other sticky olefinic wastes. The bulk of the waste gas streams generated by Chemical is directly routed to furnaces entirely owned by the Chemical facility and consumed as own-produced/own-consumed fuel. Any remaining excess Chemical waste gas stream is routed to the co-owned Fuel Gas System.

10.

At times, a system imbalance will cause a product stream to be off of quality specifications. These off-spec product streams are also routed to the Fuel Gas System to be burned as fuel, or they are flared to the atmosphere.

11.

Chemical waste gas streams have a low and inconsistent BTU

content, a high percentage of inert (non-burnable) elements such as nitrogen or carbon dioxide, a high percentage of sulfur, and also contain gummy olefinic contaminants.

12.

Refining produces and sells products including gasoline, diesel, and aviation fuel. The refining process also results in waste gas streams that have low and inconsistent BTU content, and contain a high percentage of sulfur and non-burnable wastes. As with Chemical, Refining's waste gas is a collection of byproduct gas from various refinery units and minor volumes of off-spec gases. A portion of the waste gas stream generated by Refining is directly routed to furnaces within the refining facility, where it is consumed as own-produced/own-consumed fuel. The remaining excess waste gas stream is routed to the co-owned Fuel Gas System.

13.

Prior to 1995, Shell Oil Company owned and operated a polypropylene unit within the Norco Complex. The polypropylene unit is physically integrated into the Norco manufacturing facility. The waste gas streams from the polypropylene unit are routed to the Fuel Gas System in the same manner as the streams from other manufacturing units at the complex. As a result of a proposed merger of the polypropylene businesses of Shell and a

competitor in 1993, the Federal Trade Commission issued a consent order requiring Shell to divest itself of the polypropylene unit at the Norco complex within six months of the order and to effect such arrangements as were necessary to assure the marketability and the viability and competitiveness of the unit. Union Carbide was the only available buyer of the polypropylene unit.

14.

In negotiating the purchase of the polypropylene unit, Union Carbide insisted that Shell pay for the waste gas streams that were routed to the Fuel Gas System. Shell did not want to continue receiving these waste gas streams, but the polypropylene unit would not be viable if the unit could not dispose of the waste through the Fuel Gas System. No other method for disposing of the waste gas streams was available. In order to comply with the consent order and assure the viability of the polypropylene unit, Shell Oil Company was required to pay Union Carbide to receive the waste streams.

15.

A refinery operated by Transcontinental Refining (a.k.a. Valero) was restarting operations in the late 1990's. The coker unit at the refinery started in 1998, and the catalytic cracking unit was scheduled to open in 1999. In 1998, Chemical wanted to secure the catalytic cracker dry gas as a feedstock for making

chemical products. Transcontinental Refining was willing to enter into a long term contract to sell its catalytic cracker dry gas to Chemical, but as part of the deal it wanted Chemical to purchase its coker dry gas for a short time because it lacked the capacity to use all of the coker gas.

16.

In December of 1998, Chemical agreed to purchase a limited volume of coker dry gas from Transcontinental Refining for a period of six months for either consumption as fuel or for use as a chemical feedstock. Chemical did not particularly want the coker dry gas, but agreed to purchase it in order to secure a ten year contract to purchase the desirable catalytic cracker dry gas as a feedstock. Chemical ultimately purchased the coker dry gas for about three months. Valero has tried to sell coker dry gas to Chemical twice after this initial contract expired, but Chemical refuses to buy it because it considers the gas to be an undesirable waste stream.

17.

The Fuel Gas System is a series of pipes used to gather and distribute the waste gas streams for use as fuel for boilers and furnaces throughout the Refining and Chemical complexes. For most of the Fuel Gas System, the pipes are eighteen inches in diameter. The waste streams from the individual manufacturing

units are commingled in these pipes as they are introduced into the system. There is not enough waste gas coming into the Fuel Gas System to fuel those units that receive the waste gas, so after the last of the waste gas streams is introduced to the Fuel Gas System, enough natural gas is added to meet the remaining fuel needs of the complex. Then the commingled fuel stream consisting of the waste gas streams of Refining, Chemical, and the polypropylene unit, and natural gas, pass through a much wider section of pipe, called the Blend Drum, that is somewhere between six and ten feet wide.

18.

A certain minimum proportion of the fuel in the system must be natural gas because of the ability afforded by the natural gas delivery system to automatically adjust the pressure of the delivery of natural gas. This ability is necessary to handle variations in pressure of the facilities' waste gas.

19.

The Blend Drum serves two functions. First, it further homogenizes the varying properties of the streams to enable more consistent burning. Second, it decreases the velocity of the gas, which allows any liquids in the stream to drop out through a small drain hole. Liquid in the stream would cause hazardous problems when the waste gas is consumed.

***Chemical Does Not Sell Blend Drum Fuel To Refining***

20.

When a product is sold at retail, a sales tax is due from the buyer based upon the sales price. La. Rev. Stat. § 47:302(A)(1).

21.

Pursuant to the SFA, Chemical operates the commonly-owned Fuel Gas System on behalf of both owners. On behalf of both owners, Chemical purchases the natural gas needed to fully fuel the complex. Refining and Chemical allocate fuel costs between them on a cost-neutral basis, that is to say, neither derives a profit from the other from the operation or the contents of the Fuel Gas System. Each is credited for the amount of waste gas it deposits into the Fuel Gas System, and each is charged for its use of the blended fuel coming out of the system. The energy available from the fuel is measured in British Thermal Units (BTUs). Because the amount of BTUs contained in the waste streams added to the Fuel Gas System by each facility is rarely, if ever, more than the amount of BTUs consumed by that facility, the difference between the BTUs deposited and the BTUs consumed represents the purchased natural gas and the polypropylene waste gas. In order to facilitate the accounting of each facility's

energy use, all BTUs are assigned the cost of a BTU of natural gas.

22.

Prior to 1999, Refining and Chemical accounted for the BTU value of waste gas by interoffice transfers without any cash movement. BTU credits from waste gas introduced into the Fuel Gas System were netted out by debits for fuel used. The remainder of fuel used by Refining represented its share of purchased natural gas, for which it paid. Variable operating costs were assigned to either co-owner based upon usage of the system. By this method, Chemical and Refining each paid for the amount of natural gas it consumed and for its proportionate share of the variable costs of operating the co-owned Fuel Gas System. Fixed costs of operating the system were based upon percentage of ownership of the facility, rather than use.

23.

In 1999, Refining and Chemical changed the method of allocating costs in order to use a new accounting program. Pursuant to Article 4.2(a)(iii) of the 1998 SFA, the new method was based on past practices at the Norco complex. The new program uses standardized functions for processing transactions. None of the standard functions exactly matches the former debit and credit system of allocating the waste gas, operating costs, and

natural gas costs between Chemical and Refining. Chemical and Refining chose to utilize the purchase order and sales order functions of the program to create the required accounting transactions as the closest means of replicating the cost allocation method used under the old accounting system. These standardized functions required the use of invoices and cash payments to settle the credits and debits between Chemical and Refining. The net of the cash payments represent a cost-neutral allocation of Chemical and Refining's use of natural gas and the cost of operating the Fuel Gas System.

24.

"Sale" means any transfer of title or possession, or both, exchange, barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property, for a consideration, and includes the fabrication of tangible personal property for consumers who furnish, either directly or indirectly, the materials used in fabrication work, and the furnishing, preparing or serving, for a consideration, of any tangible personal property, consumed on the premises of the person furnishing, preparing or serving such tangible personal property. La. Rev. Stat. § 47:301(12).

25.

The substance of a transaction, not its form or the

11

contractual instrument facilitating it, controls its characterization for tax purposes. *Monsanto Co. v. St. Charles Parish School Bd.*, 650 So. 2d 753, 756 (La. 1995). Accordingly, this Court does not concern itself with the labels given to the functions in defendants' accounting software. *Id.*

26.

Although the new accounting system provides the appearance of a sale, in substance it functions to track waste gas in and out of the Fuel Gas System and to allocate the costs of operating the Fuel Gas System and the purchase of natural gas between Refining and Chemical in proportion to the amount each consumes. No new product is fabricated in the Fuel Gas System. No consideration is provided from one party to another for the waste gas streams distributed by the system. Refining does not sell its waste gas to Chemical. Chemical does not sell a blended fuel product to Refining. Each entity carefully maintains its right to consume the energy that it introduces to the system. Each entity only pays for the natural gas it consumes. Each entity only pays for the operating costs apportionable to it. Sales tax is not owed on the accounting.

***Waste Gas Is Currently Unmarketable***

27.

If the processor of a product could have sold the product,

but instead uses it, then a use tax is due from the processor/user based upon the "cost price". La. Rev. Stat. § 47:302.

28.

"Cost price" means the actual cost of the articles of tangible personal property or the reasonable market value of the tangible personal property at the time it becomes susceptible to the use tax, whichever is less. La. Rev. Stat. 47:301(3)(a).

29.

The reasonable market value of tangible personal property is the amount a willing seller would receive from a willing buyer in an arms length exchange of that property at or near the location of the property being valued. *See* 61 La. Admin. Code pt. I, § 4301 as modified by *State v. BP Exploration & Oil, Inc.*, 686 So. 2d 823, 830-31 (La. 1997)(invalidating taxation based on the value of <u>similar</u> property). The amount which would be realized from a forced sale is not acceptable as the market value for this purpose. *Id.*

30.

Waste gases from the Fuel Gas System are not interchangeable with or comparable to domestic natural gas and cannot be introduced into the U.S. natural gas pipeline system. Thus these gases cannot be sold via the natural gas pipeline system; they

13

can only be sold through a dedicated pipeline constructed between facilities. Waste gases from the Fuel Gas System have a significant variability in hydrogen content, a greater concentration of heavier hydrocarbon molecules, more inert gases, and undesirable contaminants such as sulfuric compounds. These qualities make it unattractive for use in appliances and industrial furnaces or boilers whose combustion equipment is not specifically designed to accommodate it.

30.

Attempts to sell portions of these waste gases to other industrial users during the applicable tax period have failed.

31.

There is no market, no willing buyer, for the waste gases from the Fuel Gas System at Norco, either before they pass through the Blend Drum or after.

32.

Although no third-party sale is necessary to determine cost price, once defendants establish that there is no market for their waste gases, the burden of establishing the market value for it rests with plaintiff. *State v. Star Enterprise*, 691 So. 2d 1221, 1228 (La. App. 4th Cir. 1996) *aff'd*, *State v. BP Exploration & Oil Co., Inc.*, 686 So. 2d 823, 830 (La. 1997).

33.

The affidavit that plaintiff's counsel attached to the Complaint serves to create a presumption that all of the facts alleged in the pleading are true, and serves to shift the burden of proof to the defendants to prove contrary facts. *See* La. Rev. Stat. §§ 13:5034, 33:2841; Fed. R. Evid. 302. However, this presumption "affords the State no special advantage on questions of law." *State v. Star Enterprise*, 691 So.2d 1221, 1227 (La. App. 4th Cir. 1996). The only facts alleged in the Complaint concern the existence of jurisdictional facts, the existence of certain tax ordinances, and the course of plaintiff's attempts to examine defendants' records. The remainder of the Complaint consists of conclusions of law. The affidavit and Complaint do not establish market value.

34.

The waste gas has utility value for defendants, but value in use is not indicative of market value. *State v. Star Enterprise*, 691 So. 2d 1221, 1229-30 (La. App. 4 Cir. 1996); *State v. BP Exploration & Oil, Inc.*, 686 So. 2d 823, 830-31 (La. 1997). Although it is assigned the value of natural gas for ease of accounting, the price of natural gas does not reflect the market value for these waste gas streams. *See id.*

35.

The agreement to purchase the polypropylene waste gas stream from Union Carbide was made under compulsion of an FTC consent order and does not represent an arms' length transaction. That purchase is a forced sale for use tax purposes and does not establish market value.

36.

The circumstances of the Transcontinental Refining sale of a limited amount of coker dry gas to Chemical dictate that the fair market value of defendants' waste gas cannot be based on that sale.

37.

Plaintiff has failed to prove that defendants' waste gas streams have any market value (except for the refinery gas, which is taxed at a rate set by statute).

38.

Without a market value, there can be no cost price, and no use tax is owed.

***Alternatively, The Waste Gases Are Exempt Byproducts***

39.

Exemptions from taxation are strictly construed and must be clearly, unequivocally and affirmatively established. *Goudchaux/Maison Blanche, Inc., v. Broussard*, 590 So. 2d 1159,

1161 (La. 1991).

40.

During the period at issue in this case, Louisiana exempted natural gas, and all energy sources used as boiler fuel, except refinery gas, from sales and use tax. La. Rev. Stat. §§ 47:305(g) and (h).

41.

Since July 1 of 1996, Louisiana has exempted from the definition of a taxable "use" the use of a residue or byproduct of the processing of raw materials into articles for sale, unless that byproduct is refinery gas. La. Rev. Stat. § 47:301(18)(d). Refinery gas consumed as an energy source at the facility in which it is created and not sold is defined as a "use", taxable at a rate established by statute. *Id.* at 301(18)(d)(iii) in conjunction with 301(3)(f).

42.

Louisiana Constitution art. 6 § 28 allows the State to exempt local taxes except to the extent that authorized bonds are secured by those local taxes. Therefore, even if a use is exempted by statute it could still be taxed at the rate tied to active bonds in existence at the time the exemption was enacted.

43.

Although passage through the Blend Drum serves a purpose or

function in the distribution of the fuel gas streams, the streams are not fabricated into a new product for sale. The byproduct streams remain byproducts of the processes by which Refining and Chemical manufacture products for sale. As such, they are exempt from use tax for the most part. To the extent that the gases were not used as boiler fuel or were secured by bonds prior to July 1, 1996, defendants would be liable for taxes. However, the Court's central conclusion that these byproducts are unsold and unmarketable moots trial of the quantum attributable to this liability.

***Remaining Issue***

43.

Sales tax is due by the buyer based on the sales price, regardless of whether the item purchased has a cost price. All parties agree that the transactions between Shell and Union Carbide and between Chemical and Transcontinental Refining were sales. Therefore tax was owed based upon the sales price in those transactions. The amount due is reserved for trial on the issue of quantum.

New Orleans, Louisiana this the 6th day of June, 2007.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE